19-2596 I'm having a hard time hearing you. I'm giving a signal to our technical gurus over here. Is this better? Much better. Okay. Thank you. For conduct that occurred when he was just 15 years old, this extreme sentence squarely contravenes two threads of clearly established federal law, as interpreted by the United States Supreme Court in two path-marking decisions. First, Grammy Florida requires juvenile non-homicide offenders like Mr. Sanders to be sentenced in a way that provides them with some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. But parole eligibility under Mr. Sanders' sentence comes too late, after or only slightly before his life expectancy, to satisfy the standard. Mr. Rubenstein, is there anything in Gram or any other Supreme Court case that explains when a meaningful opportunity must take place during a juvenile's life? So, Your Honor, what Gram says is that the meaningful opportunity to obtain release has to come sufficiently soon, that the juvenile will have a chance to reenter society, to find fulfillment outside prison walls, to seek reconciliation with society. That's not something that can be satisfied by release just in time to die, as might be implied by using life expectancy as the dividing line. But that's very general language. How can you ask us on habeas review to really draw a bright line as to when that should be? So, Your Honor, I think when Gram says explicitly that it's intending to give every juvenile a chance to demonstrate maturity and reform, and that's at 560 U.S. 79, that that means that when a sentence does not allow for them to do so until just before or perhaps even after their natural life expectancy, that's not something that satisfies Gram, even on habeas review. And assuming that's true, based on the record here, how can we say that this was just before or after life expectancy? Because he admitted that his life expectancy was 63.2 years, and he's going to be released when he's 50, 51. Your Honor, he is first parole eligible at 50 or 51. I'm sorry, you're right. He's eligible then, which I think you would agree that would satisfy the meaningful review. Well, so I think that Mr. Sanders didn't actually concede that his life expectancy was 63.2 years. And in context, what he was saying is he was pointing to a general mortality table published by the U.S. Department of Health and Human Services, and he did write in his reply brief that his life expectancy was 63.2 years based on that general table. But he continued in the very same paragraph immediately that although his sentence may not be beyond that general mortality table, it can be suggested, as some have, that long-term incarceration present health and safety risks that tend to decrease life expectancy as compared to the general population. And in support, he cited authority, both case law and otherwise, that explain why this was the case. Factors such as gang violence, factors such as contagious disease, sadly especially relevant these days, do in fact considerably shorten life expectancy for those in prison for lengthy terms. Assuming it was in the reply brief, so assuming that wasn't waived, he still, he raises the question or raises the point that the life expectancy might be something less than 63.2 years that the table reflects, but there's nothing that gives an alternative life expectancy, that it wouldn't be 60 years or 61 years or 59 years. So, again, we're on habeas review. How is that an unreasonable application of the facts given the general standard under Graham and that there's nothing in the record that would give us any specific fact as to how long he may be expected to live based on his time in prison? Your Honor, it's true that Mr. Sanders didn't posit another number, a shorter number, to the Wisconsin Court of Appeals, but the Wisconsin Court of Appeals disregarded the argument entirely. And I think it clearly found the facts against the weight of the evidence when it refused to even consider the possibility that Mr. Sanders' lengthy incarceration would decrease his life expectancy. Indeed, the district court, which was well aware of the habeas standard and the restrictions on the record to what was before the state court, implicitly found that Mr. Sanders'  appealability on just those grounds. So what does it take? Ten years? Ten years shorter than life expectancy to be eligible for parole? Fifteen? Five? As Judge St. Eve points out, this is habeas. Yes, Your Honor, and we know from Montgomery that it has to be at least a few years, at least some years. And so at the very least, it has to be that. And I think that when you apply the clear language of Graham, that juveniles have to have the chance to seek a meaningful opportunity, that requires some further period. Additionally, I don't believe, Your Honors, that the median life expectancy is necessarily the right standard to use. A median is, of course, just an average. It's just a coin flip of having even a chance to demonstrate the meaningful opportunity of maturity and rehabilitation and to seek fulfillment and to reconcile with society as Graham requires. That may ultimately be true, Mr. Rubenstein, but again, how do we make that determination on habeas? How can we say that it was an unreasonable application on habeas for a standard that is nowhere in what the Supreme Court has said? Your Honor, so the only two conclusions that the Wisconsin Court of Appeals reached with respect to this argument were, one, that Mr. Sanders' life expectancy was 63.2 years. It didn't consider any arguments that they were shorter because it misread his brief. And two, that any sentence that allowed for parole eligibility at all before, even a day before, an offender's life expectancy would be enough. And that's inconsistent with Graham. That's inconsistent with Montgomery. That's inconsistent with everything the Supreme Court has said about having a chance to reenter. I guess, at the risk of repeating ourselves here a little bit, I guess what I'm, I read Graham and say, what does it hold? It holds that for a juvenile offender who did not commit homicide, the Eighth Amendment forbids the sentence of life without parole. Now, he's parole eligible within his life expectancy. You can read the rest of the opinion more broadly. You can also, as many courts have, and you can also say, well, there's some countervailing considerations here, and this is habeas, and the court hasn't gone that far yet, and we don't have to go that far yet as a state court, or as, in our case, reviewing state court decisions, saying it's not contrary to Supreme Court holdings. That's what I'm struggling with, with your argument here. Yes, your, I'm sorry, I cut you off. Well, no, the, let me ask about the meaningful opportunity. Forget about the timing. Do we evaluate on an empirical basis whether parole offers a meaningful opportunity? Is that a more formal legal test? Do we look at, and what population, if it's an empirical test, do we look at 1%, 10%? Is that a meaningful opportunity? How do we evaluate that? And what guidance does the Supreme Court give us on it? Yes, your Honor, so again, the Supreme Court says that there must be a meaningful opportunity, and not just a meaningful opportunity to seek release, but a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. So I think if whatever the standards the states are using results in 1% release rate, I think that's inconsistent with what Graham and Miller and Roper say about the likelihood that juveniles who commit even horrific offenses are to be rehabilitated. Your Honor, I think that it's, whether you look to the factors that are required to be considered, or whether you look to the actual release rates, or whether you look to a combination of both of them, what's clear in this case is that the Wisconsin system is not likely to allow Mr. Sanders to obtain the release to which, or the opportunity to seek release and to demonstrate his maturity and rehabilitation, to which he's entitled under Graham. And your Honor, even if you don't... Mr. Rubenstein, can I... Yes. You know, you've got about six minutes left. I want to make sure that we get the benefit of hearing from you on the Miller aspect of your brief. And maybe as a segue, can I ask you one question just as kind of a framing matter for that? The warden argues that that aspect of the appeal, Sanders' kind of second claim, if you will, here, is dependent on success on the first claim, the Graham argument. Do you agree with that? I don't agree with that, your Honor. And that is what the Wisconsin Court of Appeals and the district court concluded as well. But this court has already squarely held otherwise. In McKinley v. Butler, your Honor, this court has explained that even on EDPA review, Miller and the differences that identify between juvenile and adult offenders mean that a court must always, the court italicized that word, consider the age of the defendant in deciding what sentence within the statutory limits to impose on a juvenile defendant. So it doesn't matter if it's... So you read McKinley broadly, and I totally understand why. But isn't McKinley really talking about a de facto life sentence without any possibility of parole? And doesn't it make sense that that's the proper way to read McKinley given, you know, that Miller was all about, you know, mandatory, underscore mandatory life sentences? So, your Honor, the facts of McKinley were something that was tantamount to an effective life without parole sentence, but it does contain the language I just quoted. And it further states that it's holding can't logically be limited to de jure life sentences or even de facto life sentences. It applies to any sentence that's denominated in a number of years that's highly likely to lead to imprisonment for life. Here Mr. Sanders is serving a 140-year sentence. Even if he's parole eligible, there's been no suggestion that he's highly likely to obtain release before his death. And so even by McKinley's own language, it's clearly applicable to this case. In McKinley, did we grant habeas relief? No, your Honor. In McKinley, there was a separate question about the retroactivity of Miller and about whether the argument had been adequately raised in the state court. There's no problem in either of those grants here. Miller, we know, is retroactive now, and there's no argument that Mr. Sanders failed to raise this argument in the state courts. But we sent McKinley back to the state courts. That's correct. Which did grant him some relief in that case, but the federal court did not. That's correct, your Honor, but the only reason it did not... At least not yet. I'm sorry? At least not yet. That may still come back before us. We'll see. That's correct, your Honor. But again, the reason the federal court didn't grant any relief to Mr. McKinley was because of procedural wrinkles not present in this case. Your Honor, ultimately... I'm sorry? We did not reach the conclusion about whether we had to grant habeas relief. Obviously, the dissent thought it would not be appropriate, and the majority did not reach that question. That's correct, your Honor. But if the majority had believed that there was no claim, if the court had believed there was no claim, then it could have simply affirmed the district court's denial of habeas relief. That it did more suggested that it thought that there was a very strong, viable Miller claim there. Your Honor, ultimately, the court imposed a sentence here nearly triple what the prosecution had requested. It admitted that if it was warehousing Mr. Sanders, then, quote, so be it. And it noted that the prosecution's request for a lengthy period of probation was no longer needed due to the length of the sentence. That's simply not the mitigating treatment of youth and its attendant characteristics that McKinley held Miller always required. If there aren't further questions, I'd reserve the balance of my time for rebuttal. Thank you very much, Mr. Rubenstein. Ms. Burgundy for the warden. Good morning. May it please the court. My name is Sarah Burgundy, and I represent Warren Radke in this case. I'd like to start by clarifying our position on the second issue in Miller. You really shouldn't reach the Miller question at all because we're in a non-homicide juvenile case, which is controlled by Graham. So the question is really whether this is a life without parole sentence or a life with parole sentence. If it's life without parole, Graham says you can't sentence a juvenile non-homicide offender to it. So it doesn't matter how much or how little the court talked about youth. It goes away. And if it is a life with parole with meaningful opportunity, you don't get to the question of consideration of youth before imposing a life without parole sentence in a homicide case. So I just want to be clear. Those things are sort of separate. But the Miller reasoning in terms of what the court talks about in terms of youth doesn't apply in a case, you know, in a Graham case where we are. So let's bring us back to the first issue. And I'd like to just sort of recenter us on the habeas principles. I think, you know, I heard Judge St. Eve asking several times, how do we make this determination habeas? And you don't. Graham really just holds that, you know, these life, you need a meaningful opportunity for parole for these juvenile non-homicide offenders. And the question really for this court is did the Court of Appeals reasonably and correctly apply Graham in holding that a parole opportunity beginning at age 50 qualifies as a meaningful opportunity. And we have principles in Richter saying this has to be beyond any possibility for fair parole. We have White v. Woodall saying we can't require courts to extend precedent and to hold in Mr. Sanders' favor in this case would certainly extend, would extend Graham well beyond what even any other federal court or state court has done. And I think what underscores that point is the Supreme Court's decision in Virginia v. LeBlanc in 2017. That case was a habeas case. It involved a juvenile non-homicide offender who got a life sentence. His first opportunity for parole was through the state's geriatric release program, which would have begun eligibility at age 60. The Fourth Circuit, the state court said that that was a meaningful opportunity. The Fourth Circuit reversed. And when it got to the Supreme Court, they said, listen, Graham did not decide that a geriatric release program like Virginia's failed to satisfy the Eighth Amendment because that question was not presented. And it was not objectively unreasonable for the state court to conclude that because the geriatric release program employed normal parole factors, it satisfied Graham's requirement that juveniles convicted of non-homicide crime have a meaningful opportunity to receive parole. Ms. Burgundy, how about your response to Mr. Rubenstein's point that, look, this is pretty exacting to be holding Mr. Sanders in a very strict, literal way to his representation about 63.2 years. You know, he clearly made the point in substance that he's worried about not having a chance in his lifetime of being paroled. There's no question he offered 63.2 years. But Mr. Rubenstein is arguing, read his argument in substance. And this kind of literalism really has no place here. At least it may reflect a decision grounded on an unreasonable interpretation of the facts. Well, I think the, so at most what Mr. Sanders argued was my life expectancy is 63.2 years. And it could be considerably shorter based on prison. Now, just to go from that to say that the Wisconsin Court of Appeals should have considered his life expectancy to be 50, I think is a stretch. I don't know what considerably, what he means by considerably shorter and is, you know, if the court had said, well, okay, let's say it's 55. Is that right? I think, so there's that. What's showing someone like him supposed to make? I mean, isn't he saying, look, I don't know. What I'm worried about is a meaningful opportunity of parole. I don't have the resources available to me to give it to you with more precision. But I'm telling you I'm real concerned. Well, I think there were two in the court really sort of found against Sanders on two grounds. So first of all, it said, you know, he doesn't allege that he's he's this doesn't meet his life expectancy. But I think but more so it said there's really no authority for the proposition that 50 comes too late for the grand meaningful opportunity. And there really truly isn't. I mean, you have, you know, I don't know what kind of. I mean, frankly, I don't really know what kind of showing a defendant needs to make. I think courts really when you look at the cases talking about when the meaningful opportunity must come, to the extent that's something that Graham requires, which, again, I don't I don't think that's clearly established that Graham requires courts to draw lines. But you see court struggling with that, with talking about how do you even consider life expectancy? What is the right data? So do we talk about the general population? Do we talk about race and gender, which would certainly cause due process and equal protection problems at sentencing? Do we talk about prisoners all in the same state system? Do we talk about prisoners who are all born the same year? Do we bring in an actuary to say what this person's life expectancy is? Does it depend on the kind of sentencing life expectancy can change? You know, the fact that Mr. Sanders is 40 now in all likelihood would change what his life expectancy is going forward. That he that he's made it to 40 might say that he's expected to live past 50. So I think and many courts have really pointed out the problem with trying to rely on this life expectancy data. And I don't think the court really has to answer the question here. But I think really the only question is under Graham, was it reasonable for the Court of Appeals to say 50 wasn't too late? And there there really is no authority. No, no court has said that a date that early violates Graham. Ms. Burgundy, would it be a meaningful opportunity to seek parole if the relevant population of inmates won parole at a rate of 1% upon that first eligibility? Well, Graham doesn't clearly establish that it would be again. Graham Court doesn't draw any lines in terms of what type of parole or what you know what the parole would be a reasonable. Would it be a reasonable reading of Graham, you think, to say that a 1% grant rate is enough? I think it really would depend on the case, Your Honor. And I and I say that because I, you know, again, well, I want to kind of back up a bit. We actually don't have a record on what Wisconsin's parole rate is and what's what's low, what the Graham court considered to be low or too low or anything like that. If you look to, again, looking at Virginia v. LeBlanc, the court seemed mainly concerned with the parole procedure. If it allows the parole board to consider the inmates development and development rehabilitation as growth while he was an inmate, that would it's reasonable to assume that that would that would satisfy it at this point because they haven't said more. You know, and a 1% rate, 1 to 2% rate really could have a lot of factors that have nothing to do with the parole board's general release rate. It could just simply have to do with the prisoners that came up that year and that sort of thing. And I do want to point out that I don't think that the I think the Mr. Rubenstein cites a 1 to 2% as our as the release rate that was based on a study talking about life sentences, which I understand Wisconsin Department of Corrections considers life sentences as sort of a life sentence. And then it wouldn't necessarily include like a de facto life sentence or consecutive term. The data does also doesn't separate out who you know whether those people released, perhaps it was more juvenile offenders that were released. We don't know that. Okay, I understand. I think some of those problems with our record here. Could you address in the reply brief, page 15 note three. The petitioner says that, in essence, your department is taking inconsistent positions on where the appropriate forum is for challenging the parole system, and its ability to comply with with Graham and Miller as I understand it. Right. So now my understanding of our position and King was that, I mean there are a number of reasons why they didn't state a claim for relief. I'm not sure that you could go and say in night and this was a 1983 case so I not sure. I think what we were arguing in there is to say, well, if you're saying it violates the sentence violated and these were Miller cases, if this, this parole procedure violates Miller. Again, those cases only talk about sentencing and and you go there. So, what's the, I will say that. And I'm sorry I didn't mean to interrupt your honor I. What is the right forum for challenging the adequacy of Wisconsin's parole system to satisfy Graham and or Miller. Well I don't I actually frankly I don't know that that position, the position is right I've seen cases when I've kind of looked into it I've seen cases in 1983 where courts have allowed these sort of claims to go through I've seen cases in 2254 where they've allowed them to go through, and even in state court so once Mr Sanders goes up for parole if he gets an adverse decision, he can challenge that and search your worry, he can. There's other means in state court where he can challenge the parole procedures which I think would, you know, would be possible to potentially come up into federal court. I agree that if that were to happen. He would not be the state would not take the position that he has already litigated and lost this because we have to evaluate the parole system as it is applied to him when it is applied to him. Correct, I don't yet I mean and again there's no record here. Everything is speculative about what the pool boards going to do in 2030, whenever he comes up so I don't, I don't see how he could have litigated anything because there's really no record on what, on what the board is doing or will do. Um, I think I just wanted to address a point, Mr Rubenstein made on in his argument, I'm talking about the pool rates and what language and Graham. You know grant both Graham and Miller make clear there's no responsibility in the state to guarantee release. And again, neither case really talks about how likely it needs to make release or how you know how open the parole system is like and you know and frankly I don't, I don't actually really even know what, you know, a solid rate of release would be, you'd have to look at other states and bringing data and again we don't have really a record to, to compare that. And again, I was like this report sort of a point counsel in such cases. I'm sorry. Sounds like district courts ought to appoint counsel in such cases. Thank you. Seeing none. Thank you very much Miss Burgundy, Mr Rubenstein for rebuttal. Thank you, Your Honors. I don't think it's quite right to say that Mr Sanders didn't raise the parole claim until this court he did say in his reply brief to the Wisconsin Court of Appeals that the release rate was low, and that got no response from that court just like his argument that his life expectancy is actually shorter, got no response from that court. And what Graman tells us is that the opportunity to obtain release has to be both meaningful and realistic. And when the rates of release are so low, be they 1%, be they 2%, even be they 10%, that's not enough to create the hope for release and the motivation to seek reconciliation and to rehabilitate oneself that's required by Graman that's underlying Miller. Your Honors, I think that the distinction between the 1983 challenges to the parole system and the habeas challenges is that 1983 is the proper method to challenge the constitutionality of the parole system directly. But that's not what Mr. Sanders is doing here. Mr. Sanders is challenging the constitutionality of his sentence, and as even the warden admits, his sentence is an effective life sentence except for the possibility of parole. So under Gram, parole is functioning sort of as an affirmative defense, something that the state is interposing to say, no, no, no, notwithstanding his 140-year sentence, it's actually not a life sentence. In that context, as a response to Mr. Sanders' habeas argument under Gram, it's perfectly appropriate to look to the particulars of that system, just as courts have done in Funchess and just as states have done in State v. Young. Mr. Rubenstein, the difficulty with that argument for me is that it seems very hard from where we sit right now to look at the Wisconsin parole system and to say that there's something about the way it's structured legally or practically that we could conclude right now as a matter of law is going to foreclose a meaningful opportunity of parole. These are my words. No one's argued it this way. It's almost as if it's a facial challenge to the parole system through the prism of Mr. Sanders' predicament here, and that seems ill-advised to me. I see I'm almost out of time, Your Honor. May I answer? Please. Your Honor, I think that, again, because we're not challenging—I would agree with Your Honor if we were challenging the constitutionality of the system directly, but because we're responding to the state's claim that parole is what makes the sentence legal, that's what makes it permissible to do at this stage. Judge Hamilton, can I ask just one more question? Please. Mr. Rubenstein, this is a bit off-point but timely. Mr. Rubenstein, am I correct that you clerk for Justice Ginsburg? That's correct. You have our sympathies. Thank you, Your Honor. Okay. If there's nothing further, we would ask this court to reverse the district court's denial of Mr. Sanders' habeas petition. All right. Thanks to both counsel. Mr. Rubenstein, thank you to your firm and to you personally for the assistance you've provided the client, your client and the court as a whole. We'll take the case under advisement and move on to the final.